Edinson Herrera Ramirez v. State of Maryland, No. 72, September Term, 2018

**INEFFECTIVE ASSISTANCE OF COUNSEL – PERFORMANCE PRONG – DEFICIENT PERFORMANCE – PREJUDICE PRONG –PRESUMPTION OF PREJUDICE –** In this burglary case, where prospective juror disclosed during *voir dire* that he had been victim of burglary and that he believed that that would affect his ability to be fair and impartial, and where petitioner's trial counsel did not ask follow-up questions of prospective juror, move to strike prospective juror for cause based on response to "crime victim" question, or exercise peremptory challenge against prospective juror, Court of Appeals concluded that petitioner had proven deficient performance, *i.e.*, petitioner's trial counsel's performance fell below objective standard of reasonableness.

Court held that, in assessing petitioner's allegation of ineffective assistance of counsel, court should presume that trial counsel's performance prejudiced petitioner only if: (1) petitioner was actually denied assistance of counsel; (2) petitioner was constructively denied assistance of counsel; or (3) petitioner's counsel had actual conflict of interest. Absent these three circumstances, presumption of prejudice does not apply, and petitioner must prove prejudice. That said, Court held that petitioner failed to prove prejudice, as, at trial, State offered strong direct and circumstantial evidence of guilt.

Circuit Court for Carroll County
Case No. 06-K-05-033033
Argued: June 7, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 72

September Term, 2018

_____

EDINSON HERRERA RAMIREZ

v.

STATE OF MARYLAND

_____

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Booth
Wilner, Alan M. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.
McDonald, J., concurs and dissents.

_____

Filed: July 12, 2019

*Greene, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Md. Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

 Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

Under the Sixth Amendment to the Constitution of the United States and Article 21 of the Maryland Declaration of Rights, a defendant in a criminal case has "a right to effective assistance of counsel." Newton v. State, 455 Md. 341, 355, 362, 168 A.3d 1, 9, 13 (2017) (citation omitted). In a petition for postconviction relief, a petitioner may contend that he or she is entitled to a new trial on the ground of ineffective assistance of trial counsel. See id. at 349, 168 A.3d at 5. A petitioner has received ineffective assistance of trial counsel where trial counsel's performance was deficient, and prejudiced him or her. See id. at 355, 168 A.3d at 9. Generally, a petitioner has the burden to prove both deficient performance and prejudice. See United States v. Cronic, 466 U.S. 648, 658 (1984). There are, however, circumstances under which "a presumption of prejudice is appropriate[,]" which obviates the need for "inquiry into the [] conduct of the trial." Id. at 660.

This case requires us to determine whether trial counsel's conduct fell below an objective standard of reasonableness, and, if so, whether a presumption of prejudice applies, or whether the petitioner must prove prejudice, where he alleges that trial counsel's conduct resulted in structural error.[1]

In the Circuit Court for Carroll County, the State, Respondent, charged Edinson Herrera Ramirez, Petitioner, with several crimes that arose out of an armed robbery.

---

[1]A structural error is an error that inheres in the trial's structure—i.e., "the framework within which the trial proceeds"—and that "affect[s] the trial from beginning to end, and necessarily render[s it] fundamentally unfair." Redman v. State, 363 Md. 298, 303 n.5, 768 A.2d 656, 659 n.5 (2001) (cleaned up). Meanwhile, a trial error is "an error in the trial process itself"—i.e., "an error [that] occur[s] during the presentation of the case to the jury[.]" Id. at 303 n.5, 768 A.2d at 659 n.5 (cleaned up). On direct appeal, a structural error always warrants reversal of the defendant's convictions, and cannot be deemed harmless. See id. at 303 n.5, 768 A.2d at 659 n.5.

During *voir dire*, the circuit court asked the prospective jurors whether they, their relatives, or their close friends had ever had experiences as victims of crime, defendants, or witnesses in criminal cases that would "affect[ their] ability to render a fair and impartial verdict[.]" Juror 27 answered that, approximately a year-and-a-half earlier, his apartment had been "broken into[.]" The circuit court asked whether "that experience[ would], in any way, affect [his] ability to render a fair and impartial verdict in this case[.]" Juror 27 responded: "I believe it would." Trial counsel did not ask Juror 27 any follow-up questions, or request that the circuit court do so. Juror 27 did not respond to any other questions during *voir dire*.

Trial counsel did not move to strike Juror 27 for cause based on his response to the "crime victim" question, but rather moved to strike another prospective juror, Juror 25, for cause on the ground that his "home was broken into" and his "response as to whether it would affect them was, I believe it would." Juror 25, however, had not responded to any questions during *voir dire*. In addition to failing to move to strike Juror 27 for cause based on his response to the "crime victim" question, trial counsel did not exercise a peremptory challenge with respect to Juror 27, who was seated as a juror. After the jury had been selected and the circuit court dismissed the prospective jurors who had not been seated, trial counsel advised the circuit court that Juror 27 "just vehemently started shaking his head and just looked right at [her] with not a very pleasant face." At that time, trial counsel moved to strike Juror 27, stating that the juror was not "happy about the fact that he's sitting on [the] jury[.]" The circuit court reserved ruling on the motion to strike Juror 27 to "see how he [would] react[] during the course of the trial." The circuit court stated that it was

- 2 -

up to trial counsel whether to re-raise the issue. Trial counsel did not renew the motion to strike Juror 27, or otherwise raise any issue as to Juror 27 after moving to strike him following jury selection.

The jury found Ramirez guilty of eleven charges. After an unsuccessful direct appeal, Ramirez petitioned for postconviction relief, contending that trial counsel engaged in ineffective assistance of counsel by not moving to strike Juror 27 for cause based on his response to the "crime victim" question and by not using a peremptory challenge against Juror 27. The circuit court denied the petition. Ramirez appealed, and the Court of Special Appeals affirmed. Ramirez filed a petition for a writ of *certiorari*, which this Court granted.

Before us, Ramirez asserts that trial counsel rendered ineffective assistance of counsel, and that the presumption of prejudice applies because trial counsel caused structural error—namely, the seating of a biased juror. The State responds that trial counsel's performance did not fall below an objective standard of reasonableness, that this case's circumstances fall outside of the ones under which the presumption of prejudice applies, and that Ramirez has failed to prove prejudice.

We hold that Ramirez has proven that his trial counsel's performance was deficient, but has not established prejudice. Ramirez's trial counsel's conduct fell below an objective standard of reasonableness because, during *voir dire*, she failed to ask any follow-up questions, move to strike for cause, or use a peremptory challenge against a juror who indicated that he had previously been the victim of a burglary, and that he believed that that would affect his ability to be fair and impartial. In assessing a petitioner's allegation

- 3 -

of ineffective assistance of counsel, however, a court should presume that trial counsel's performance prejudiced the petitioner only if: (1) the petitioner was actually denied the assistance of counsel; (2) the petitioner was constructively denied the assistance of counsel; or (3) the petitioner's counsel had an actual conflict of interest. Absent these three circumstances, the presumption of prejudice does not apply, and the petitioner must prove prejudice.

Ramirez does not contend that this case involves any of the circumstances under which the presumption of prejudice applies; and, upon independent review, we are satisfied that the presumption of prejudice does not apply here. Accordingly, Ramirez has the burden of proving both deficient performance and prejudice. That said, we conclude that Ramirez has not proven prejudice, given that the State offered strong—indeed, overwhelming—direct and circumstantial evidence of his guilt.

## BACKGROUND

### Jury Selection

On July 12, 2005—*i.e.*, the first day of trial—fifty-one prospective jurors appeared before the circuit court. During *voir dire*, the circuit court asked the prospective jurors: "Have you[,] or any member of your family or close friends[,] ever been victims of a crime, accused of a crime[,] or a witness in a criminal case[,] and that experience affects your ability to render a fair and impartial verdict?" Multiple prospective jurors, including Juror 27, responded. The following exchange occurred:

THE COURT: What is your experience, please?

JUROR [] 27: I had an apartment that was broken into about a year-and-a-

- 4 -

half ago.

> THE COURT: All right. Would that experience, in any way, affect your ability to render a fair and impartial verdict in this case?
>
> JUROR [] 27: I believe it would.

Trial counsel did not ask Juror 27 any follow-up questions, or request that the circuit court do so. Juror 27 did not respond to any other questions during *voir dire*.

After the circuit court finished asking questions of the prospective jurors, the court asked counsel whether they would move to strike any prospective jurors for cause, and the following exchange occurred:

> [RAMIREZ'S TRIAL COUNSEL]: Juror No. 25: Their home was broken into. Their response as to whether it would affect them was, I believe it would.
>
> THE COURT: State's position?
>
> [PROSECUTOR]: No objection.
>
> THE COURT: We'll strike, then.
>
> THE CLERK: Number 25?
>
> [RAMIREZ'S TRIAL COUNSEL]: That is No. 25.

Contrary to Ramirez's trial counsel's statement, Juror 25 had not stated that his or her residence had been broken into. In fact, Juror 25 had not responded to any questions during *voir dire*.

After the circuit court ruled on the motions to strike for cause, the circuit court stated: "If we run out, we can go with what we have and bring some more people tomorrow. . . . Tomorrow, we'll bring in another panel to try and [v]oir [d]ire them and then . . . try to

pick additional jurors."

The parties also had the opportunity to exercise peremptory challenges against prospective jurors. Ramirez was permitted ten peremptory challenges.[2] Ultimately, Ramirez's trial counsel exercised peremptory challenges against nine prospective jurors; in other words, there was one peremptory challenge left after jury selection. When trial counsel was given the opportunity to use a peremptory challenge as to Juror 27, she stated that Juror 27 was "[a]cceptable." Once twelve jurors were seated, trial counsel stated: "The array is acceptable to the Defense."

The courtroom clerk swore the jury, and the circuit court dismissed the prospective jurors who had not been seated. Immediately afterward, trial counsel requested a bench conference, which the circuit court granted. At the bench conference, the following exchanged occurred:

> [RAMIREZ'S TRIAL COUNSEL]: As to Juror [] 27, who is the young man that is seated in the yellow shirt, I would ask that he be stricken for cause. **Upon the Court excusing the [prospective] jurors[ who had not been seated], he just vehemently started shaking his head and just looked right at me with not a very pleasant face.** I don't think [that] he's happy about the fact that he's sitting on this jury, and I think that that would be sufficient to ask [that] he be stricken for cause.
>
> THE COURT: Well, it also should be noted that there was a lot of glee from those who made it out without being chosen. Go ahead. Do you wish to respond?

---

[2]A defendant is permitted ten peremptory challenges where the highest maximum sentence to which a defendant is subject on any single count is at least twenty years of imprisonment, but less than life imprisonment. See Md. Code Ann., Cts. & Jud. Proc. (1974, 2013 Repl. Vol.) § 8-420(b); Md. R. 4-313(a)(3). The State charged Ramirez with robbery with a dangerous weapon and first-degree burglary, the maximum sentence for each of which is twenty years of imprisonment. See Md. Code Ann., Crim. Law (2002, 2012 Repl. Vol.) §§ 3-403(b), 6-202(c).

[PROSECUTOR]: I would -- I didn't see that.  It's a situation where I would defer.

[RAMIREZ'S TRIAL COUNSEL]: I'm sorry? What ...

THE COURT: Well, I'm gonna reserve on that. We have two alternates. We'll entertain that issue and see how he reacts during the course of the trial.

[RAMIREZ'S TRIAL COUNSEL]: Thank you, Your Honor.

THE COURT: I'll leave it to the Defense to re-raise ...

THE CLERK: I'm sorry.

THE COURT: ... the issue.

THE CLERK: I'm -- I'm sorry, I didn't pick it up ...

THE COURT: I'll deny it at this time.

* * *

THE COURT: The State is -- I mean, the Defense is to bring it back up before the jury retires if there -- if they still wanna go and raise the issue.

(Emphasis added) (ellipses in original) (paragraph break omitted).  Trial counsel did not renew the motion to strike Juror 27 for cause, or otherwise raise any issue as to him after moving to strike him for cause.

**Trial Testimony**

At trial, as a witness for the State, Linda Hidey testified that, in the summer of 1999, she and her husband, Rodney Hidey, had a house built at 3112 Ridge Road in Westminster. For "a couple of months[,]" Ramirez worked on the construction of the house.  On multiple occasions during that period, Ms. Hidey talked to Ramirez, who, according to her, "spoke perfect English."  One day, Ms. and Mr. Hidey drove a safe to the construction site, and

- 7 -

Ramirez helped move the safe into the area that would become the house's basement. Starting from the time when the house was being built, the safe "was covered[,]" such that "no one would have known what it was." The safe's existence was not well-known, and Ms. and Mr. Hidey did not talk about the safe because they did not want to "ever [] let other people know about it."

In November 1999, Ms. and Mr. Hidey moved into the house. Ultimately, Ms. and Mr. Hidey had three minor children, who lived with them.

On or about September 6, 2004, Ms. and Mr. Hidey and their children returned home from a trip. On the way home, Ms. Hidey listened to a voicemail in which an employee of a security company informed her that an alarm in the house had gone off on September 4, 2004. Ms. and Mr. Hidey found that a basement window was unlocked.

On October 11, 2004, at approximately 10 p.m., Ms. Hidey was at the house with her three children. Her two sons, ages three and five at the time, were in their bedrooms on the second floor. Her daughter, age six at the time, was asleep on the couch in the family room on the first floor. No one else was in the house; Mr. Hidey was away from home, attending a meeting.

While Ms. Hidey was at the top of the stairs, she saw two men enter the house. One man had a "small build[,]" was wearing gloves and a green ski mask, and had a revolver with "a very long barrel" pointed at Ms. Hidey. The other man had "a stocky build," was "probably" 5'10" or 5'11", was wearing gloves and an orange ski mask, and had a sawed-off shotgun pointed at Ms. Hidey. Ms. Hidey testified that Ramirez's "physical appearance matche[d] that of the man [in] the orange [ski] mask" "[i]n reference to his build[,] and

based on what he was wearing that evening[,] his height[, a]nd his weight." The man in the orange ski mask never said anything loud enough for Ms. Hidey to hear his voice.

The man in the green ski mask asked Ms. Hidey: "Where's the money?" Ms. Hidey reached into her pockets to retrieve the cash that she had on her. The man in the green ski mask said: "I don't want your money[. W]here's the real money?" The man in the green ski mask told Ms. Hidey to come downstairs, and she obeyed. The man in the green ski mask again asked Ms. Hidey: "Where's the money?" The man in the orange ski mask whispered in the ear of the man in the green ski mask. The man in the green ski mask asked Ms. Hidey: "Where's the safe?" Ms. Hidey responded that the safe was in the basement. The man in the green ski mask said: "Show me[.]" Ms. Hidey went downstairs and showed the men where the safe was.

The man in the green ski mask told Ms. Hidey to open the safe. Ms. Hidey responded that she did not know the combination. The man in the orange ski mask again whispered in the ear of the man in the green ski mask. The man in the green ski mask asked Ms. Hidey: "[W]here's your husband?" Ms. Hidey responded that Mr. Hidey was at a meeting. The man in the green ski mask said: "I believe her[.] I believe [that] she doesn't know the combination[.] . . . [W]e'll just wait for him[.]" Ms. Hidey and the men went back upstairs. While waiting for Mr. Hidey to return home, the man in the green ski mask told Ms. Hidey to remain calm, and that, if she did not cooperate, and if Mr. Hidey did not cooperate when he came home, they would kill Ms. and Mr. Hidey, their daughter, and their two sons.

Ms. Hidey heard the chime that the security system made whenever a car pulled into

the driveway. The man in the green ski mask told Ms. Hidey to sit on the couch in the family room and not move, and she obeyed. The man in the green ski mask went into the dining room, and the man in the orange ski mask went into the kitchen and crouched out of sight of the exterior door. Mr. Hidey entered the house through that door. The man in the orange ski mask jumped out and pointed the shotgun at him. Mr. Hidey went into the dining room, where the man in the green ski mask pointed the revolver at him. Ms. Hidey "heard a big scuffle," but could not see it. The men led Mr. Hidey into the family room. The man in the green ski mask told Ms. and Mr. Hidey and their daughter to sit on the floor, and they complied. The man in the green ski mask said to Mr. Hidey: "Don't be stupid. . . . Where's the safe? . . . . Let's go, you're gonna open the safe."

The men, Ms. and Mr. Hidey, and their daughter went to the basement and approached the safe. The man in the green ski mask said: "Open the safe[.]" Mr. Hidey tried to open the safe, then tried to grab the shotgun from the man in the orange ski mask. The man in the orange ski mask bludgeoned Mr. Hidey with the shotgun, and the man in the green ski mask shot Mr. Hidey with the revolver. Mr. Hidey fell to the floor, saying that he had been hit, meaning that he had been shot.

The man in the green ski mask again told Mr. Hidey to open the safe. Mr. Hidey resumed trying to open the safe, but he had difficulty because he was shaking and bleeding profusely from head wounds. The man in the green ski mask told Mr. Hidey: "You have five minutes[,] or . . . we're gonna kill you[.]" Mr. Hidey kept trying to open the safe. The man in the green ski mask told Mr. Hidey: "You have three minutes." Mr. Hidey said: "I can't do it. . . . I'm shaking[.] I'm bleeding[.] I can't even think[.]" Ms. Hidey asked Mr.

Hidey: "Can you tell me the combination so I can open it?" Mr. Hidey did so, and Ms. Hidey opened the safe, which contained approximately $80,000 in cash. The men put the cash into a pillowcase. The man in the orange ski mask tied Ms. Hidey and her daughter to an exercise machine in the basement, tied up Mr. Hidey while he was lying on the floor, and the men left. Mr. Hidey got himself untied and called 911.

As a witness for the State, Mr. Hidey's testimony was essentially the same as Ms. Hidey's. Mr. Hidey testified that, in the summer of 1999, the house at 3112 Ridge Road was being built. For approximately two months during that time, Ramirez worked for Mr. Hidey. On multiple occasions during that period, Mr. Hidey talked to Ramirez, and "could communicate with him perfectly fine." One day, Ms. and Mr. Hidey bought a safe and drove it to the construction site. Ramirez helped Mr. Hidey move the safe into the area that would become the house's basement. Ramirez and Mr. Hidey dug a hole, put the safe into it, and covered the safe with plastic, cardboard, and tape so that there was "no way [that] you could tell [that] it was a safe." Aside from Ms. and Mr. Hidey and Ramirez, no one was present when the safe was placed. Mr. Hidey believed that he had never told anyone about the safe's existence, though he acknowledged that it was possible that he once spoke to an employee of a concrete company about the safe.

On or about September 6, 2004, Mr. Hidey listened to a voicemail in which an employee of a security company informed him that an alarm in the house had gone off on September 4, 2004. Mr. Hidey checked the basement window, and saw that it was unlocked.

On October 11, 2004, at approximately 10 p.m., Mr. Hidey came home from a

meeting. Mr. Hidey entered the house through the kitchen, and saw Ms. Hidey and their daughter in the family room. A 5'11" man in an orange ski mask appeared and pointed a sawed-off shotgun at Mr. Hidey. The man in the orange ski mask never said anything. Mr. Hidey testified that the man in the orange ski mask was "the same height" as, and had "the same build" as, Ramirez. Additionally, the man in the orange ski mask had dark-brown eyes and a unibrow that "exactly" matched Ramirez's.

Mr. Hidey entered the dining room, and a "[s]kinny" man of "average height" in a green ski mask pointed a .22 caliber revolver at him. Mr. Hidey said: "Hey, what's going on here?" The man in the green ski mask said: "Get back in the f[***]ing kitchen." The man in the orange ski mask pointed the shotgun at Mr. Hidey again. Mr. Hidey put his hands up and went into the family room. The man in the green ski mask asked either whether there was a safe in the house, or where the safe was. Mr. Hidey responded: "[W]e don't have a safe[.]" At the time, Mr. Hidey did not know that Ms. Hidey had shown the safe to the men. After Mr. Hidey realized as much, he, Ms. Hidey, their daughter, and the men went to the basement and approached the safe.

Mr. Hidey attempted to open the safe but could not. Mr. Hidey "lunged at" the man in the orange ski mask and grabbed the shotgun. A struggle ensued. The man in the orange ski mask "regain[ed] control of the [] shotgun[,]" and then used it to hit Mr. Hidey's head, shoulders, and back. Mr. Hidey's head started bleeding. The man in the green ski mask shot Mr. Hidey's left inner thigh and again told him to open the safe. Mr. Hidey could not open the safe because blood was getting in his eyes and on the safe. Ultimately, Ms. Hidey opened the safe, which contained approximately $80,000 in cash. The man in the orange

- 12 -

ski mask put the cash into a pillowcase, then tied Ms. Hidey and their daughter to an exercise machine, made Mr. Hidey lie on the floor, and tied his hands and feet together. After the men left, Mr. Hidey got himself untied and called 911.

As a witness for the State, Larry Fincham[3] testified that, in summer 2004, he encountered an acquaintance named Jerry Burkett. Fincham asked Mr. Burkett if he knew anyone whom he "could get some work from." Mr. Burkett introduced Fincham to Ramirez, who had a painting business. Ramirez, Fincham, and Mr. Burkett did painting jobs together.

On September 4, 2004, Fincham and Mr. Burkett went to a Big Lots, where Mr. Burkett bought two Halloween masks. Mr. Burkett told Fincham that he and Ramirez wanted to burglarize a particular house on Ridge Road.[4] Ramirez told Fincham that "he knew that there was a safe in the floor[,] and that . . . the owner who live[d] there [did] not believe in banks." Ramirez also said: "I need money. I know the money's there." Mr. Burkett responded: "[H]ow can you be sure of that?" Ramirez said that he "knew [that] the man had that kind of money in his house."

Later on that date, Mr. Burkett wiped off a crowbar and a saw and put them, as well as the two Halloween masks, into a duffel bag. Mr. Burkett told Fincham that he and

---

[3]Fincham was not charged in connection with the October 11, 2004 armed robbery. That said, at trial, during Fincham's testimony, the circuit court admitted into evidence a letter that the prosecutor prepared, stating that Fincham would not be convicted of a September 4, 2004 attempted burglary if he testified truthfully.

[4]Fincham testified that Mr. Burkett said that he and Ramirez "want[ed] to burglarize this house . . . on 27[.]" Mr. Hidey testified that the front of the house at 3112 Ridge Road faces Maryland Route 27.

Ramirez "wanted to be dropped off" and picked up after an hour. With Mr. Burkett and Ramirez as passengers, Fincham drove Mr. Burkett's truck up Ridge Road toward Taylorsville. Fincham pulled over, and Mr. Burkett and Ramirez took the duffel bag, exited Mr. Burkett's vehicle, and ran toward a wooded area. Fincham drove to a 7-Eleven, and, sometime afterward, drove down Ridge Road toward Westminster. Fincham saw Mr. Burkett and Ramirez, and pulled over to pick them up. Mr. Burkett told Ramirez: "I told you there was an alarm in there." Mr. Burkett said that, when they had opened a window, an alarm went off, and they fled.

Approximately two or three days later, while Ramirez, Fincham, and Mr. Burkett were together, Ramirez once again said that "he knew [that] there was money in the man's safe because he didn't believe in banks." Ramirez and Mr. Burkett "wanted [Fincham] to drive the get[]away car[,] and then they [were] talking about . . . shotguns and [] pistols." Fincham left because he did not want anything to do with an armed robbery.

As a witness for the State, Naomi Burkett,[5] Mr. Burkett's wife, testified that, in summer 2004, Ramirez, Fincham, and Mr. Burkett did painting jobs together. On the evening of September 4, 2004, Mr. Burkett left the Burketts' residence with a duffel bag of tools, and Fincham drove away with Ramirez and Mr. Burkett in Ms. Burkett's vehicle. Later that night, Ramirez, Fincham, and Mr. Burkett returned to the Burketts' residence,

---

[5]Ms. Burkett was charged in connection with the October 11, 2004 armed robbery. Ms. Burkett and the State entered into a plea agreement, pursuant to which she pled guilty to robbery with a dangerous weapon, conspiracy to rob with a dangerous weapon, and first-degree assault, and the State recommended a sentence of five years of imprisonment. One condition of the plea agreement was that Ms. Burkett testify against Ramirez and Mr. Burkett.

and "talk[ed] about robbing this place[,] and they didn't do it because . . . the people weren't home[,] and there was security on the whole building." Ms. Burkett testified that Ramirez said that he had worked in the house and put a safe in it, and that he knew that there was "a lot of money" in the safe. In subsequent days, Ramirez "kept saying [that] he needed money[,] and [that] he knew [that] they had a lot of money there."

A few weeks before October 11, 2004, Mr. Burkett asked Ramirez to bring a shotgun to the Burketts' residence so that he could saw it off. Ramirez brought a pump-action shotgun to the Burketts' residence, and Mr. Burkett sawed it off. Approximately a week before October 11, 2004, Ramirez and Mr. Burkett gave Ms. Burkett an orange ski mask and asked her to sew it because the eyeholes were too big. Ms. Burkett complied, and gave the orange ski mask to Ramirez.

At some point, Mr. Burkett asked Ms. Burkett to buy a handgun for him. On October 4, 2004, Ms. Burkett bought a .22 caliber revolver and ammunition. On October 6, 2004, Ms. Burkett took possession of the revolver and ammunition. Afterward, Ms. Burkett gave the revolver and ammunition to Mr. Burkett.

On the night of October 11, 2004, Mr. Burkett put the revolver, the ammunition, and a green ski mask into a pillowcase. Mr. Burkett asked Ms. Burkett to drive him to Ramirez's residence, and she did so. Ramirez—who had a sawed-off shotgun and the orange ski mask that Ms. Burkett had sewn—exited his residence and "said [that] he couldn't get a driver." Mr. Burkett asked Ms. Burkett to drive Ramirez's vehicle. With Mr. Burkett and Ramirez as passengers, Ms. Burkett drove Ramirez's vehicle up Ridge Road, and dropped them off in the area of a house. Ramirez gave Ms. Burkett a walkie-

talkie. Mr. Burkett and Ramirez took the guns and the pillowcase, exited Ramirez's vehicle, and put on the ski masks. Ms. Burkett drove away. Approximately forty-five minutes later, Ramirez used the walkie-talkie to tell Ms. Burkett: "[P]ick us up. . . . We shot somebody[.]" Ms. Burkett picked up Mr. Burkett and Ramirez across the street from the house on Ridge Road. Mr. Burkett said that he and Ramirez had "left the tool bag behind, but he said [that] he wasn't worrying about it because there [were] no fingerprints on the tools."

Ms. Burkett drove Mr. Burkett and Ramirez back to Ramirez's residence. There, the Burketts and Ramirez removed cash from the pillowcase and counted it. Ms. Burkett testified that the pillowcase had contained approximately $80,000 in cash.

As a witness for the State, Gail Vollmer testified that, in February 1996, she met Ramirez, and, at some point, they began dating. When Ms. and Mr. Hidey were having a house built, Ramirez told Vollmer that there would be a safe in the house. In late October 2004, on Vollmer's behalf, Ramirez made a $2,000 down payment on a car. In January 2005, Ramirez telephoned Vollmer and, without specifying a date, said: "[T]hey're saying that I was involved in this . . . robbery[,] but that was the night [that] me and you went to the casino." Ramirez and Vollmer had gone to a casino many times before. Vollmer told Ramirez: "I don't remember [the] dates [when] I went to the casino." Ramirez responded: "[Y]ou gotta just go in and tell them what you know. . . . [T]ell the truth[,] and I'm not gonna get mad at you either way. If you don't remember, you don't remember." Without explaining how she learned that the armed robbery had occurred on October 11, 2004, Vollmer testified that she reviewed her credit card receipts and checking account records,

but could not determine whether she had gone to the casino on October 11, 2004.

As a witness for the State, David Santana testified that, on December 3, 2004, Ramirez telephoned him from Canada and asked him to retrieve cash that Ramirez had hidden and send the funds to him. Ramirez told Santana that he had hidden the cash in a box underneath some rocks near a particular trail that is in or near Harpers Ferry, West Virginia. Santana found the box, which contained $9,850 in cash.

As a witness for the State, Trooper First Class David Kitzinger of the Maryland State Police testified that, on October 12, 2004, he responded to the crime scene at 3112 Ridge Road. Trooper First Class Kitzinger recovered a green ski mask in a culvert or ditch by the side of Ridge Road. The circuit court admitted the green ski mask into evidence during Trooper First Class Kitzinger's testimony. Previously, Ms. Burkett testified that the green ski mask in evidence belonged to Mr. Burkett; Ms. Hidey testified that the green ski mask in evidence "look[ed] like the" one that one of the robbers had worn; and Mr. Hidey testified that the green ski mask in evidence "look[ed] exactly like" the one that one of the robbers had worn, as he recognized a "white thread" and a part near an eyehole that had been "sewn shut[.]"

As a witness for the State, Trooper First Class Eric Workman of the Maryland State Police testified that, on January 5, 2005, he met with Mr. Burkett. Afterward, Trooper First Class Workman went to a residence in Westminster, looked under a shed on the property, and recovered a box, which contained a revolver. The circuit court admitted the revolver into evidence during Trooper First Class Workman's testimony. Previously, Ms. Burkett testified that the revolver in evidence was the one that she had bought for Mr. Burkett; Ms.

Hidey testified that the revolver in evidence "look[ed] like the" one that the man in the green ski mask had carried; and Mr. Hidey testified that the revolver in evidence "look[ed] very similar, if not the exact same" as the one that the man in the green ski mask had carried. The parties stipulated that the revolver in evidence was operable.

As a witness for the State, Trooper James Mayo of the Maryland State Police testified that, on October 12, 2004, he responded to the crime scene at 3112 Ridge Road. Trooper Mayo recovered a duffel bag behind a group of mailboxes. The duffel bag contained two Halloween masks, two crowbars, a grinder, an extension cord, a hammer, and a chisel. The circuit court admitted the duffel bag into evidence during Trooper Mayo's testimony. Previously, Ms. Burkett testified that the duffel bag in evidence belonged to Mr. Burkett, and Fincham testified that the duffel bag in evidence was the one that Mr. Burkett had put a crowbar, a saw, and two Halloween masks into on September 4, 2004.

As a witness for the State, Corporal Diane Conaway of the Carroll County Sheriff's Office testified that, on January 6, 2005, she and other law enforcement officers executed a search warrant at the Burketts' residence. Corporal Conaway found a saw and an orange ski mask. The circuit court admitted the saw and the orange ski mask into evidence during Corporal Conaway's testimony. Previously, Ms. Burkett testified that the saw in evidence belonged to Mr. Burkett, and that he had used it to saw off the shotgun. Ms. Burkett also testified that the orange ski mask in evidence belonged to Mr. Burkett, and that she had sewn and given to Ramirez a "similar" orange ski mask.

**Verdicts and Direct Appeal**

On the last day of trial, at 2:58 p.m., the jury retired to deliberate. The jury did not

submit any notes during deliberations. At 5:54 p.m., the jury returned to the courtroom.

The jury found Ramirez guilty of all eleven charges—*i.e.*, two counts each of robbery with a dangerous weapon, robbery, and first-degree assault, and one count each of first-degree burglary, conspiracy to rob with a dangerous weapon, use of a handgun in the commission of a crime of violence, possession of an unregistered firearm,[6] and theft of property with a value of at least $500. Ramirez appealed, and the Court of Special Appeals affirmed his convictions. See Ramirez v. State, 178 Md. App. 257, 292, 941 A.2d 1141, 1161 (2008). Ramirez filed a petition for a writ of *certiorari*, which this Court denied. See Ramirez v. State, 410 Md. 561, 979 A.2d 708 (2009).

### Petition for Postconviction Relief

On May 14, 2014, Ramirez petitioned for postconviction relief, contending, among other things, that his trial counsel rendered ineffective assistance of counsel by refraining from either moving to strike Juror 27 for cause based on his response to the "crime victim" question, or by exercising a peremptory challenge as to Juror 27. On February 3, 2015, the circuit court conducted a hearing on the petition for postconviction relief.

At the hearing, as a witness for the State, Ramirez's trial counsel testified that, on the first day of trial, she arrived at the courthouse early and obtained a list with each prospective juror's name, age, occupation, and marital status. Trial counsel made notations as to any prospective jurors who were lawyers or members of law enforcement agencies. Ramirez and his trial counsel met in private, and she provided her "impression of the

---

[6]At the sentencing proceeding, the State dismissed the charge for possession of an unregistered firearm.

overall jury pool[.]" Trial counsel explained the jury selection process, including the number of peremptory challenges that were available. Trial counsel asked him to tell her if he felt that any particular prospective juror should not be seated—whether he had "had contact with" the prospective juror, or he simply had "a hunch that" he did not "like" the prospective juror. During *voir dire*, Ramirez and his trial counsel discussed motions to strike for cause and peremptory challenges.

Ramirez's trial counsel could not "remember exactly what" Juror 27 had said during *voir dire*, but she remembered that "[t]here had been an incident in [his] background that had caused [him] to not answer the question as to being fair and impartial as forcefully as [she] would have liked to see before seating" him. In other words, what Juror 27 "said [] gave an indication that perhaps he needed to be . . . looked at more closely with respect to whether or not [he] could be fair or impartial."

On October 29, 2015, the circuit court issued an opinion and order denying the petition for postconviction relief. The circuit court concluded that Ramirez's trial counsel's performance was reasonable, and, alternatively, it did not prejudice him. The circuit court explained that Ramirez had not identified any evidence that Juror 27 "showed bias[,]" and had "instead [] offered mere conjecture." The circuit court declined to "speculate that the outcome would have been different had Juror [] 27 not been on the jury."

**Remand**

Ramirez appealed. On March 13, 2018, the Court of Special Appeals issued an order remanding the case to the circuit court with instruction to determine whether the trial transcript was accurate in indicating that Ramirez's trial counsel had moved to strike Juror

25—as opposed to Juror 27—for cause. On March 22, 2018, the circuit court judge who presided at the postconviction hearing issued an order, stating that he had reviewed the trial transcript and listened to an audio recording of the relevant portions of the trial, and found that the trial transcript was accurate in indicating that trial counsel moved to strike Juror 25—as opposed to Juror 27—for cause.

**Opinion of the Court of Special Appeals**

On June 18, 2018, the Court of Special Appeals affirmed the circuit court's judgment, holding that it did not err in denying the petition for postconviction relief. See Edinson Herrera Ramirez v. State, No. 2342, Sept. Term, 2015, 2018 WL 3025900, at *1 (Md. Ct. Spec. App. June 18, 2018). The Court of Special Appeals concluded that Ramirez's trial counsel had not rendered ineffective assistance of counsel by refraining from moving to strike Juror 27 for cause based on his response to the "crime victim" question, or not using a peremptory challenge as to Juror 27. See id. at *6. The Court of Special Appeals determined that trial counsel's performance was reasonable, stating:

> To be sure, trial counsel admitted at the post[]conviction hearing that Juror [] 27's answer to the [] "crime victim" question was troubling; however, she explained that it was not the answer that she found troubling as much as the fact that the juror did "not answer the question...as forcefully as [she] would have liked." Given [] that Juror [] 27 gave no response to other pertinent questions, namely, whether he could decide a burglary case on the evidence and whether there was "any reason" he could not be fair or impartial, it is entirely possible that trial counsel ultimately discounted Juror [] 27's less-than-forceful response to the ["]crime victim["] question. Moreover, trial counsel did ultimately challenge Juror [] 27 after he expressed displeasure at having been selected as part of the jury. That trial counsel was willing to challenge Juror [] 27 for that reason, but not for his response to the ["]crime victim["] question, suggests that his answer to the ["]crime victim["] question was not overly consequential in light of the surrounding circumstances.

- 21 -

Furthermore, trial counsel testified that a great number of factors went into her decision to challenge potential jurors, including their age and occupation, whether they had a background in law enforcement or as an attorney, and whether Ramirez had any personal feelings about a particular juror. Trial counsel also testified that, as prospective jurors were removed for cause or pursuant to a peremptory [challenge], the number of [prospective] jurors dwindled to the point that there was a possibility that the parties would run out of prospective jurors and be forced to come back the next day with a fresh pool of [prospective] jurors. Given that St. Mary's County is one of the smaller counties in Maryland, it is possible that a fresh jury pool would have resulted in a selection of prospective jurors who were even less desirable than Juror [] 27. Although that factor is not, by itself, the most compelling justification for failing to strike Juror [] 27, it is indicative [] that trial counsel's decision not to [move to] strike Juror [] 27 was affected by a myriad of factors and competing interests. In short, we cannot say that trial counsel's decision not to [move to strike] Juror [] 27 was constitutionally ineffective based solely on [his] response to the ["]crime victim["] question.

Finally, the record makes plain that Ramirez was actively involved in the *voir dire* process, including the decision to challenge (or not challenge) prospective jurors.

Id. (ellipsis in original) (citations omitted).

The Court of Special Appeals concluded that, even if trial counsel's performance were deficient, it did not result in prejudice. See id. The Court of Special Appeals rejected Ramirez's contention that a presumption of prejudice applied because trial counsel's performance resulted in structural error. See id. at *8. The Court of Special Appeals pointed out that Ramirez had not identified any binding cases that stood for the proposition that "the presumption of prejudice" applied to "situations where courts have found there to be a 'structural error' (and thus prejudice presumed) following a direct appeal[.]" Id. at *7. The Court of Special Appeals determined that Ramirez had failed to prove prejudice, explaining:

Other than Juror [] 27's response to the [] "crime victim" question, which, as previously discussed, may not have been overly consequential under the

circumstances, Ramirez has provided no evidence or argument to suggest that he was prejudiced by Juror [] 27's presence on the jury. In fact, Ramirez seems to suggest that Juror [] 27's response to the ["]crime victim["] question constituted *per se* proof that [Juror 27] was irrevocably biased and, as a result, was automatically disqualified as a prospective juror. That proposition, however, is not consistent with the law regarding jury selection in Maryland, as bias is a question of fact [that is] to be decided by the trial [court], [which], pursuant to [its] discretion, determines whether a cause for disqualification exists. In short, Ramirez's general claim that the seating of a "biased" juror somehow tainted the jury, while conceivable, is insufficient to show that the inclusion of Juror [] 27 undermined the proper functioning of the adversarial process or created a substantial likelihood of a different result.

Id. at *9 (citations omitted).

## Petition for a Writ of *Certiorari*

On December 7, 2018, Ramirez filed a petition for a writ of *certiorari*, raising the following four issues:

[1.] Did the [Court of Special Appeals] err when it held that a structural error did not occur when a biased juror was not stricken from the jury by his trial counsel[?]

[2.] Did the [Court of Special Appeals] err when it held that[,] even if a structural error occurred[,] Ramirez was not prejudiced?

[3.] Was [] Ramirez denied effective assistance of counsel []?

[4.] Did the [Court of Special Appeals] err when[,] as support for its decision[,] it used the number of prospective jurors in St. Mary's County when trial in this case was held in Carroll County?

On February 22, 2019, this Court granted the petition. See Ramirez v. State, 462 Md. 557, 201 A.3d 1229 (2019). We answer the questions in the negative and affirm the judgment of the Court of Special Appeals.

- 23 -

**The Parties' Contentions**

Ramirez contends that his trial counsel rendered ineffective assistance of counsel by failing to either move to strike Juror 27 for cause based on his response to the "crime victim" question, or use a peremptory challenge as to Juror 27. Ramirez points out that Juror 27 answered that he had been a victim of a burglary, and that he (Ramirez) was charged with first-degree burglary. Ramirez argues that his trial counsel's performance was deficient because allowing the seating of a biased juror cannot be sound trial strategy. Ramirez asserts that the presumption of prejudice applies because his trial counsel caused structural error. Ramirez contends that, even if the presumption of prejudice does not apply, the record demonstrates prejudice because Juror 27 stated that he believed that his experience as a victim of a burglary would affect his ability to be fair and impartial. Ramirez argues that there was a significant possibility that the trial's outcome would have differed if Ramirez's trial counsel had peremptorily challenged Juror 27.[7]

The State responds that Ramirez's trial counsel did not provide ineffective assistance of counsel. The State contends that Ramirez has not rebutted the presumption that trial counsel's decision not to move to strike Juror 27 for cause based on his response to the "crime victim" question, or to use a peremptory challenge as to Juror 27, was based

---

[7]Ramirez also maintains that the Court of Special Appeals erred in observing in its opinion "that St. Mary's County is one of the smaller counties in Maryland[.]" Ramirez, 2018 WL 3025900, at *6. Ramirez correctly points out that he was tried in the Circuit Court for Carroll County. Ramirez provides data from United States Census Bureau that indicates that, in 2005, Carroll County's population was more than 70,000 higher than St. Mary's County's.

on trial strategy.  The State argues that Ramirez has failed to prove that the circuit court would have granted a motion to strike Juror 27 for cause based on his response to the "crime victim" question.  The State asserts that this case's circumstances fall outside of the ones under which the presumption of prejudice applies, and that Ramirez has failed to prove prejudice.

## Standard of Review

In reviewing a trial court's ruling on a petition for postconviction relief, an appellate court reviews for clear error the trial court's findings of fact, and reviews without deference the trial court's conclusions of law, including a conclusion as to whether the petitioner received ineffective assistance of counsel.  See Newton, 455 Md. at 351-52, 168 A.3d at 7.

## Ineffective Assistance of Counsel Generally

As it is well known, in Strickland v. Washington, 466 U.S. 668, 687 (1984), the Supreme Court set forth a two-prong test for resolving a claim of ineffective assistance of counsel.  The first prong is known as "the performance prong[,]" and the second prong is known as "the prejudice prong[.]"  Newton, 455 Md. at 356, 168 A.3d at 9 (citing Strickland, 466 U.S. at 697).

To satisfy the performance prong, a petitioner "must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [] by the Sixth Amendment."  Strickland, 466 U.S. at 687.  More specifically, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  Id. at 688.  The Supreme Court set forth a presumption that counsel's

performance was not deficient, stating:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Id. at 689-90 (cleaned up).

To satisfy the prejudice prong, a petitioner "must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." Id. at 687. More specifically, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In State v. Syed, 463 Md. 60, 86-87, 204 A.3d 139, 154 (2019), this Court explained: "We have interpreted *reasonable probability* to mean 'there was a substantial or significant possibility that the verdict . . . would have been affected.'" (Quoting Bowers v. State, 320 Md. 416, 426, 578 A.2d 734, 739 (1990)) (emphasis in original). In Strickland, 466 U.S. at 695-96, the Supreme Court explained how to assess prejudice as follows:

> [A] court hearing an ineffectiveness claim must consider the totality of the

evidence before the . . . jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences [that were] to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict [that is] only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the [petitioner] has met the burden of showing that the decision [that was] reached would reasonably likely have been different absent the errors.

## The Presumption of Prejudice Generally

Generally, where a petitioner alleges ineffective assistance of counsel, "the burden rests on" him or her to satisfy both the performance prong and the prejudice prong. Cronic, 466 U.S. at 658. However, "[i]n certain Sixth Amendment contexts, prejudice is presumed." Strickland, 466 U.S. at 692. For example, "prejudice is presumed when counsel is burdened by an actual conflict of interest." Id. (citation omitted). Additionally, "[a]ctual or constructive denial of the assistance of counsel altogether is [] presumed to result in prejudice. So are various kinds of [S]tate interference with counsel's assistance." Id. (citing Cronic, 466 U.S. at 659 & n. 25). In Cronic, 466 U.S. at 659-60—which the Supreme Court issued on the same date as Strickland—the Supreme Court offered specific examples of circumstances under which the presumption of prejudice applies, stating:

Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the [petitioner] is denied counsel at a critical stage of [the] trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in [a certain case] because the petitioner had been denied the right of effective cross-

examination[,] which would be constitutional error of the first magnitude[,] and no amount of showing of want of prejudice would cure it.

Circumstances of that magnitude may be present on some occasions when[,] although counsel is available to assist the [petitioner] during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the [] conduct of the trial.

(Cleaned up).

In Bowers, 320 Md. at 425, 578 A.2d at 738, this Court stated: "[P]utting aside those few situations in which prejudice is presumed (actual or constructive denial of counsel and actual conflict of interest), the [petitioner] must show that the particular [] unreasonable errors of counsel [] had an adverse effect on the defense." (Cleaned up).

In Walker v. State, 391 Md. 233, 252, 892 A.2d 547, 558 (2006), this Court rejected a petitioner's contention that prejudice should have been presumed because, after the petitioner failed to appear for trial, his trial counsel "decided essentially to remain silent, to protect the record as best as he could under the circumstances, to participate minimally, and to argue jury nullification[.]" This Court was unpersuaded that the petitioner's "trial counsel, although present in the courtroom, failed to subject the State's case [] to 'meaningful adversarial testing,' thereby warranting a presumption of prejudice." Id. at 247, 892 A.2d at 555. This Court held that the petitioner's trial "counsel's conduct was not so antithetical to effective assistance that the *Cronic* presumption of prejudice should apply. Moreover, his conduct did not amount to the complete failure of representation at every aspect of the trial proceeding[.]" Walker, 391 Md. at 252, 892 A.2d at 558. This Court explained that "the Supreme Court has made clear that the *Cronic* exception to the general rule requiring proof of prejudice based on deficient performance is a very narrow

exception, and that[,] for the exception to apply, [counsel]'s failure must be complete."

Walker, 391 Md. at 247, 892 A.2d at 555 (cleaned up). This Court summarized the

Supreme Court's case law regarding the presumption of prejudice as follows:

> [In *Cronic*, t]he [Supreme] Court identified three situations implicating the right to counsel that involved circumstances [that were] so likely to prejudice the [petitioner] that the cost of litigating their effect in a particular case is unjustified. The first situation was where the [petitioner] was completely denied counsel. Complete denial of counsel includes, for example, when counsel was either totally absent, or prevented from assisting the [petitioner] during a critical stage of the proceeding. The second situation warranting a similar presumption of prejudice was if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing[,] because this results in an adversary process itself that is presumptively unreliable. The final situation was . . . where the [petitioner] faces circumstances in which it is not likely that any attorney could provide effective assistance. **With the exception of these three situations, a [petitioner] must articulate how specific errors of counsel undermined the reliability of the finding of guilt, *i.e.*, the [petitioner] must prove [] prejudice.**

Walker, 391 Md. at 246-47, 892 A.2d at 554-55 (cleaned up) (emphasis added).

## Structural Error and the Presumption of Prejudice

Redman v. State, 363 Md. 298, 303, 768 A.2d 656, 658-59 (2001) was the first case

in which this Court addressed both structural error and ineffective assistance of counsel.

In Redman, id. at 301, 768 A.2d at 657, a petitioner's trial counsel "was unaware that[ the

p]etitioner, who was charged with first[-]degree murder and subject to the death penalty,

had an automatic right to remove the case to another county." In a postconviction

proceeding, the petitioner alleged ineffective assistance of counsel, and contended "that

prejudice should [have been] presumed because the right of removal is a fundamental

right[,] or qualifies as a structural error [that is] not susceptible to establishing prejudice."

Id. at 303, 768 A.2d at 659 (footnote omitted). The petitioner relied on Arizona v.

Fulminante, 499 U.S. 279, 284-85 (1991), in which the Supreme Court held that the admission of a coerced confession is subject to the doctrine of harmless error—*i.e.*, that the admission of a coerced confession is a trial error rather than a structural error. See Redman, 363 Md. at 303, 768 A.2d at 659.

In Redman, id. at 303 n.5, 768 A.2d at 659 n.5, this Court stated that the "[p]etitioner [was] inappropriately scrambling the eggs of" Fulminante and Strickland, as Fulminante "was a refinement of the federal harmless error analysis[,]" whereas Strickland "involved an evaluation of counsel's performance and an assessment of prejudice." This Court concluded that the petitioner's "[c]ounsel's error in [Redman was] not the type in which prejudice will be presumed." Redman, 363 Md. at 313, 768 A.2d at 664.

Similarly, in Newton, 455 Md. at 357, 347, 168 A.3d at 10, 4, this Court rejected a petitioner's contention that prejudice should have been presumed because there had allegedly been a structural error—namely, the petitioner's counsel had "consent[ed] to the presence of an alternate juror during deliberations." This Court found instructive the Supreme Court's decision in Weaver v. Massachusetts, 137 S. Ct. 1899 (2017), stating:

> In *Weaver*, the petitioner argued that the presumption of prejudice due to a structural error—a violation of her public-trial right—satisfied [the] prejudice prong. The Supreme Court rejected this argument and held that the petitioner must still show [] prejudice. *Weaver*, 137 S. Ct. at 1911. The Court explained that "the reasons an error is deemed structural may influence the proper standard used to evaluate an ineffective-assistance claim premised on the failure to object to that error." *Id.* at 1907. It assumed, without reaching the issue, that the prejudice prong could be satisfied if the attorney's errors were "so serious as to render [the] trial fundamentally unfair"—the third category of structural error. *Id.* at 1911.
> **The *Weaver* Court explained that[,] even though a public-trial right violation requires automatic reversal on direct appeal, it is still analyzed under the *Strickland* framework when raised as part of an**

**ineffective-assistance-of-counsel claim.** Citing finality interests, the Court noted that[,] if a new trial is granted on direct appeal, "there may be a reasonable chance that not too much time will have elapsed for witness memories still to be accurate and physical evidence not to be lost." *Id.* at 1912. In addition, reviewing courts are in a better position to instruct trial courts on facts and legal principles to consider on remand. *Id.* Postconviction courts, by contrast, assess ineffective-assistance-of-counsel claims through the *Strickland* lens and do not address the merits of particular trial court errors. The *Weaver* Court reasoned that these differences justify imposing a higher standard for granting a new trial when a defendant raises a structural error on postconviction, rather than on direct appeal. *Id.*; *see also Strickland*, 466 U.S. at 693-94[] ("The [*Strickland*] standard [] reflects the profound importance of finality in criminal proceedings.").

**Applying *Weaver*, we conclude that[,] to succeed on his ineffective-assistance-of-counsel claim, [the petitioner] must establish *Strickland*'s deficient performance and prejudice prongs.**

Newton, 455 Md. at 356-57, 168 A.3d at 9-10 (emphasis added) (some alterations in original).

## Analysis

Upon a careful review of the record, we conclude that Ramirez has proven deficient performance, but has not proven prejudice. We will address the performance prong first.[8]

The background that is relevant to the performance prong is as follows. During *voir dire*, the circuit court asked the prospective jurors whether they, their relatives, or their

---

[8]In Strickland, 466 U.S. at 697, the Supreme Court explained: "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." In certain prior cases, this Court has disposed of claims of ineffective assistance of counsel by addressing only the prejudice prong. See, e.g., Newton, 455 Md. at 366, 168 A.3d at 15. Here, because Ramirez has failed to prove prejudice, we need not address the performance prong; nonetheless, we do so in the interest of making clear the precise nature of Ramirez's trial counsel's errors. Given that Ramirez alleges structural error and that he is entitled to a presumption of prejudice, it is necessary to review the nature of trial counsel's deficient performance.

- 31 -

close friends had ever had experiences as victims of crime, defendants, or witnesses in criminal cases that would "affect[ their] ability to render a fair and impartial verdict[.]" Juror 27 answered that, approximately a year-and-a-half earlier, his apartment had been "broken into[.]" The circuit court asked whether "that experience[ would], in any way, affect [his] ability to render fair and impartial verdict in this case[.]" Juror 27 responded: "I believe it would." Ramirez's trial counsel did not ask Juror 27 any follow-up questions, or request that the circuit court do so. Juror 27 did not respond to any other questions during *voir dire*.

Ramirez's trial counsel did not move to strike Juror 27 for cause based on his response to the "crime victim" question, but moved to strike Juror 25 for cause on the ground that his "home was broken into" and his "response as to whether it would affect them was, I believe it would." Juror 25, however, had not responded to any questions during *voir dire*. The circuit court granted the motion to strike Juror 25 for cause.

Ramirez was permitted ten peremptory challenges. Ultimately, Ramirez's trial counsel exercised nine peremptory challenges. When trial counsel was given the opportunity to exercise a peremptory challenge as to Juror 27, she stated that Juror 27 was "[a]cceptable." Once twelve jurors were seated, Ramirez's trial counsel stated: "The array is acceptable to the Defense."

After the courtroom clerk swore the jury and the circuit court dismissed the prospective jurors who had not been seated, Ramirez's trial counsel requested a bench conference, which the circuit court granted. At the bench conference, trial counsel advised the circuit court that, after it dismissed the prospective jurors who had not been seated,

Juror 27 "just vehemently started shaking his head and just looked right at [her] with not a very pleasant face." Trial counsel moved to strike Juror 27 on the ground that he was not "happy about the fact that he's sitting on [the] jury[.]" The circuit court reserved ruling on the motion to strike Juror 27 to "see how he [would] react[] during the course of the trial." The circuit court stated that it was up to trial counsel whether to re-raise the issue. Trial counsel did not renew the motion to strike Juror 27, or otherwise raise any issue as to him after moving to strike him.

Before issuing its opinion, the Court of Special Appeals remanded this case to the circuit court with instruction to determine whether the trial transcript was accurate in indicating that Ramirez's trial counsel moved to strike Juror 25—as opposed to Juror 27—for cause based on his response to the "crime victim" question. The circuit court issued an order, stating that it had reviewed the trial transcript and listened to an audio recording of the relevant portions of the trial, and found that the trial transcript was accurate in indicating that Ramirez's trial counsel had moved to strike Juror 25—as opposed to Juror 27—for cause based on his response to the "crime victim" question.[9]

Viewed together, these circumstances make inescapably clear that Ramirez's trial counsel intended to move to strike a prospective juror for cause based on the prospective juror's response to the "crime victim" question, but inadvertently moved to strike Juror 25 for cause, when Juror 25 had not responded to the "crime victim" question. By contrast,

_____

[9]Similarly, in its brief, the State advises that employees of the Carroll County State's Attorney's Office listened to an audio recording of *voir dire*, and stated that the trial transcript was accurate in indicating that Juror 27—as opposed to Juror 25—had responded to the "crime victim" question.

Juror 27 stated that his home had been broken into, and that he believed that that would affect his ability to be impartial; yet, trial counsel did not move to strike Juror 27 for cause based on his response to the "crime victim" question. Rather, inexplicably, trial counsel moved to strike Juror 25—who had not answered any questions during *voir dire*—for cause on the ground that he had stated that his home had been broken into, and that he believed that that would affect his ability to be impartial. Given that the circuit court has advised that the relevant portions of the trial transcript are accurate, it is not possible to conclude that trial counsel's failure to move to strike Juror 27 for cause was based on trial strategy. It would be illogical to conclude that trial counsel moved to strike Juror 25 for the response to the "crime victim" question that was given by Juror 27, but refrained from moving to strike Juror 27 for cause based on trial strategy. Indeed, one plausible explanation for trial counsel's motion to strike Juror 25 for cause is that she misattributed Juror 27's response to the "crime victim" question to Juror 25, and made the motion to strike for cause with respect to the wrong prospective juror. This circumstance would clearly not constitute trial strategy.

We are satisfied that Ramirez has met the burden to prove that his trial counsel's performance was deficient. No reasonable lawyer in Ramirez's trial counsel's position would have, as she did, refrained from asking or requesting any follow-up questions of Juror 27, refrained from moving to strike him for cause based on his response to the "crime victim" question, and refrained from exercising a peremptory challenge as to Juror 27. Trial counsel moved to strike for cause Juror 25 based on a purported response to the "crime victim" question that was the same as that given by Juror 27. This circumstance

- 34 -

demonstrates that trial counsel was of the view that Juror 27's response to the "crime victim" question warranted a motion to strike for cause. Yet, trial counsel allowed Juror 27 to be seated without any follow-up inquiry, motion to strike for cause, or peremptory challenge. From our perspective, this conduct "fell below an objective standard of reasonableness . . . under prevailing professional norms." Strickland, 466 U.S. at 688.

We do not endorse the State's contention that Ramirez's trial counsel "may have determined" that Juror 27 "was acceptable" because "he did not respond affirmatively to other questions [that were] designed to ferret out bias based on the nature of the offense[s.]" Ostensibly, the State is referring to the circuit court's questions regarding whether any prospective juror knew "of any reason why he or she could not be a juror and decide a case in which the defendant is charged with [f]irst[-d]egree [b]urglary and related charges based solely upon the evidence[,]" or knew "of any reason, [] whatsoever, why he or she could not decide a case involving these particular offenses and discharge his or her duty as juror fairly and impartially and based solely on the evidence[.]" Simply put, the circumstance that Juror 27 did not respond to either of these questions does not constitute evidence that Ramirez's trial counsel exercised trial strategy by not moving to strike Juror 27 for cause based on his response to the "crime victim" question.

We can also quickly dispose of the State's argument that Ramirez's trial "counsel could reasonably have decided not to use her last peremptory challenge against" Juror 27 because that would have resulted in Juror 43 being seated. During *voir dire*, Juror 43 disclosed that she had read about the armed robbery of Ms. and Mr. Hidey in newspapers; that she had done business with Mr. Hidey; that, five-and-a-half years earlier, she had

"walked in on an attempted burglary of [her] home"; that "the impound lot that [her] husband and [she] own . . . ha[d] been burglarized several times"; and that these circumstances would "[p]ossibly" affect her ability to be fair and impartial. Ramirez's trial counsel made a motion to strike Juror 43 for cause, which the circuit court denied. Juror 42 was the last prospective juror to be seated as a juror, and Ramirez's trial counsel exercised a peremptory challenge against Juror 43 as an alternate juror.

These circumstances do not establish that Ramirez's trial counsel compared Jurors 27 and 43, viewed Juror 27 as "the lesser of two evils," and refrained from exercising a peremptory challenge against the juror on that basis. The record demonstrates that trial counsel moved to strike Juror 25 for cause based on an alleged response to the "crime victim" question that Juror 25 never gave. It is conceivable that, at the time that trial counsel began exercising peremptory challenges against prospective jurors, she was under the mistaken impression that the circuit court had already stricken for cause the prospective juror who had disclosed that he believed that his experience as a victim of a burglary would affect his ability to be fair and impartial. In other words, trial counsel may have refrained from using a peremptory challenge as to Juror 27 because she was unaware of Juror 27's responses to the "crime victim" question—not because she wanted to avoid allowing Juror 43 to be seated.

The State's theory—*i.e.*, that Ramirez's trial counsel refrained from exercising a peremptory challenge against Juror 27 because she wanted to avoid allowing Juror 43 to be seated—is pure speculation. At the postconviction hearing, trial counsel did not testify that she refrained from using her last peremptory challenge on Juror 27 because she wanted

to avoid allowing Juror 43 to be seated. Instead, trial counsel testified that she remembered that "[t]here had been an incident in [Juror 27's] background that had caused [him] to not answer the question as to being fair and impartial as forcefully as [she] would have liked to see before seating" him, and that what Juror 27 "said [] gave an indication that perhaps he needed to be . . . looked at more closely with respect to whether or not [he] could be fair or impartial." In short, trial counsel's testimony did not indicate in any way that her failure to use a peremptory challenge as to Juror 27 was a matter of trial strategy. Nor did trial counsel's testimony indicate that her failure to move to strike Juror 27 for cause based on his response to the "crime victim" question was a matter of trial strategy.

Ramirez's trial counsel's performance was not salvaged by the motion to strike Juror 27 after the jury was sworn. The motion to strike Juror 27 was based on his demeanor upon not being dismissed, not his response to the "crime victim" question. By the time that the jury was sworn, it was too late for trial counsel to move to strike Juror 27 for cause based on his response to the "crime victim" question, as she had already stated that the jury was acceptable. "Generally, a party waives his or her voir dire objection going to the inclusion or exclusion of a prospective juror (or jurors) or the entire venire if the objecting party accepts unqualifiedly the jury panel (thus seated) as satisfactory at the conclusion of the jury-selection process." State v. Stringfellow, 425 Md. 461, 469, 42 A.3d 27, 32 (2012) (citation omitted).

Unlike the Court of Special Appeals, we do not attach significance to the circumstance that "the record makes plain that Ramirez was actively involved in [] *voir dire*[], including the decision to challenge (or not challenge) prospective jurors." Ramirez,

2018 WL 3025900, at *6. It is the responsibility of defense counsel, not the defendant, to identify which prospective jurors to challenge. Indeed, nearly all defendants are laypeople, and a number of them have never witnessed a trial before. We decline to hold it against a petitioner who alleges ineffective assistance of counsel that he or she did not direct his or her trial counsel to challenge a particular prospective juror.[10]

Having addressed the performance prong, we turn to the prejudice prong. We hold that, in assessing a petitioner's allegation of ineffective assistance of counsel, a court should presume that trial counsel's performance prejudiced the petitioner only if: (1) the petitioner was actually denied the assistance of counsel; (2) the petitioner was constructively denied the assistance of counsel; or (3) the petitioner's counsel had an actual conflict of interest. Absent these three circumstances, the presumption of prejudice does not apply, and the petitioner must prove prejudice.

As a threshold matter, we cannot conclude that trial counsel's failure to ask follow-

---

[10]As to the issue of the Court of Special Appeals's reference to St. Mary's County, in assessing trial counsel's performance during *voir dire*, we do not take into account the population of the county in which the trial occurred. The Court of Special Appeals reasoned: "Given that St. Mary's County is one of the smaller counties in Maryland, it is possible that a fresh jury pool would have resulted in a selection of prospective jurors who were even less desirable than Juror [] 27." Ramirez, 2018 WL 3025900, at *6 (citation omitted). As Ramirez notes, the Court of Special Appeals referred to the wrong county, as he was tried in the Circuit Court for Carroll County. A particular county's population is not material to an assessment of trial counsel's performance during *voir dire*. Regardless of a county's population, a trial court is obligated to procure enough prospective jurors to constitute a jury, while allowing the parties the opportunity to move to strike prospective jurors for cause and/or use peremptory challenges. See Md. R. 4-312(a)(2). Indeed, here, after the circuit court ruled on the motions to strike for cause, the circuit court stated: "If we run out, we can go with what we have and bring some more people tomorrow. . . . Tomorrow, we'll bring in another panel to try and [v]oir [d]ire them and then . . . try to pick additional jurors."

up questions, move to strike, or peremptorily challenge Juror 27 caused structural error, *i.e.*, error that rendered Ramirez's trial fundamentally unfair. To be sure, Juror 27's response—that he believed that his experience as a victim of burglary would affect his ability to render a fair and impartial question—merited, at a minimum, follow-up questions by trial counsel. Trial counsel's failure to take any action whatsoever with respect to Juror 27 was conduct that fell below an objective standard of reasonableness. It is far from clear, however, that this conduct resulted in structural error. Not every claim with respect to the failure to strike or challenge an allegedly biased juror will result in a determination that a trial was fundamentally unfair. And, even if we were to determine structural error, that would not relieve Ramirez of the obligation to prove prejudice when alleging the ineffective assistance of counsel. See Weaver, 137 S. Ct. at 1912; Newton, 455 Md. at 357, 168 A.3d at 10.[11]

The Supreme Court's opinions in Strickland, 466 U.S. at 692, and Cronic, 466 U.S.

---

[11]We note that, in Hughes v. United States, 258 F.3d 453 (6th Cir. 2001), a case which at first blush appears comparable to this one, the Sixth Circuit, in actuality, applied the presumption of prejudice based on case law pertaining to direct appeal. To be sure, the facts of Hughes are similar to this case. And, the Sixth Circuit reasoned that the presumption of prejudice was applicable because "[t]he 'presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.'" Hughes, 258 F.3d at 463 (quoting United States v. Gonzalez, 214 F.3d 1109, 1111 (9th Cir. 2000)). In reaching this conclusion, the Sixth Circuit relied on Gonzalez, 214 F.3d at 1110. Gonzalez, 214 F.3d at 1110, was a direct appeal case that involved allegations of error by a trial court—not a postconviction proceeding that involved allegations of ineffective assistance of trial counsel, like Hughes and this case. Moreover, Hughes was issued in 2001, prior to the Supreme Court's holding in Weaver. Supreme Court and Maryland case law make clear that, in the event of structural error, the doctrine of harmless error does not apply on direct appeal; but, in an ineffective assistance of counsel case, the petitioner must still prove prejudice. See Weaver, 137 S. Ct. at 1910, 1913; Newton, 455 Md. at 357, 347, 168 A.3d at 10, 4; Redman, 363 Md. at 303 n.5, 768 A.2d at 659 n.5.

at 658-62, establish that the presumption of prejudice applies only under three circumstances. First, "[a]ctual . . . denial of the assistance of counsel altogether is [] presumed to result in prejudice." Strickland, 466 U.S. at 692. Actual denial of the assistance of counsel occurs where "counsel was either totally absent, or prevented from assisting the [petitioner] during a critical stage of the proceeding." Cronic, 466 U.S. at 659 n.25 (citations omitted). Second, "constructive denial of the assistance of counsel altogether is [] presumed to result in prejudice." Strickland, 466 U.S. at 692. Constructive denial of the assistance of counsel occurs where, even though counsel was neither absent nor prevented from assisting the petitioner during a critical stage of the proceeding, the circumstances still amount to a denial of the assistance of counsel. For example, constructive denial of the assistance of counsel occurs where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing[.]" Cronic, 466 U.S. at 659. Third, "prejudice is presumed when counsel [was] burdened by an actual conflict of interest"—i.e., when "counsel actively represented conflicting interests[.]" Strickland, 466 U.S. at 692 (cleaned up). In Cronic, 466 U.S. at 658-62 & n.24-31, the Supreme Court discussed at length its prior cases involving the presumption of prejudice. It is reasonable to infer that, if the presumption of prejudice applied under any circumstance other than the above-discussed three, the Supreme Court would have stated as much in its thorough discussion of the presumption of prejudice in Cronic.

This Court has recognized that, in Strickland, 466 U.S. at 692, and Cronic, 466 U.S. at 658-62, the Supreme Court set forth the limited circumstances under which the presumption of prejudice applies. For example, in Bowers, 320 Md. at 425, 578 A.2d at

- 40 -

738, this Court stated: "[P]utting aside those few situations in which prejudice is presumed (actual or constructive denial of counsel and actual conflict of interest), the defendant must show that the particular and unreasonable errors of counsel 'actually had an adverse effect on the defense.'" (Quoting Strickland, 466 U.S. at 693). Similarly, in Walker, 391 Md. at 247, 892 A.2d at 555, this Court explained that, "[w]ith the exception of the[] three situations" that the Supreme Court identified in Cronic, 466 U.S. at 658-62, "a defendant must articulate 'how specific errors of counsel undermined the reliability of the finding of guilt,' *i.e.*, the defendant must prove [] prejudice." (Quoting Cronic, 466 U.S. at 659 n.26).

Consistently, this Court has also recognized that the Strickland and Cronic presumption of prejudice does not apply simply because the petitioner alleges that his or her trial counsel caused structural error. For example, in Redman, 363 Md. at 303, 313, 768 A.2d at 659, 664, this Court rejected the petitioner's contention that prejudice should have been presumed because his counsel caused a structural error by failing to advise him of his right to have the case removed to another county. This Court explained that the "[p]etitioner [was] inappropriately scrambling the eggs of" the Supreme Court's case law regarding structural error and the Supreme Court's case law regarding ineffective assistance of counsel. Id. at 303 n.5, 768 A.2d at 659 n.5.

In Newton, 455 Md. at 357, 347, 168 A.3d at 10, 4, this Court rejected a petitioner's contention that prejudice should have been presumed because his counsel had caused structural error by consenting to the presence of an alternate juror during deliberations. This Court observed that, in Weaver, 137 S. Ct. at 1911, the Supreme Court held that, "even though a public-trial right violation requires automatic reversal on direct appeal, it is still

analyzed under the *Strickland* framework when raised as part of an ineffective-assistance-of-counsel claim." Newton, 455 Md. at 356, 168 A.3d at 9.  This Court also noted that, in Weaver, 137 S. Ct. at 1912, the Supreme Court explained that there is "a higher standard for granting a new trial when a defendant raises a structural error on postconviction, rather than on direct appeal."  Newton, 455 Md. at 357, 168 A.3d at 10.

In Weaver, 137 S. Ct. at 1910, the Supreme Court made clear that the distinction between structural errors matters only on direct appeal—not in a postconviction proceeding.  The Supreme Court observed:

> Despite its name, the term 'structural error' carries with it no talismanic significance as a doctrinal matter.  It means **only** that the government is not entitled to deprive the defendant of a new trial by showing that the error was harmless beyond a reasonable doubt.  Thus, in the case of a structural error where there is an objection at trial and the issue is raised **on direct appeal,** the defendant generally is entitled to automatic reversal regardless of the error's [] effect on the outcome.

Id. (cleaned up) (emphasis added).  The Supreme Court also explained: "When a structural error is preserved and raised on direct review, . . . a new trial generally will be granted as a matter of right.  When a structural error is raised in the context of an ineffective-assistance claim, however, finality concerns are far more pronounced."  Id. at 1913.  The case law of both the Supreme Court and this Court demonstrates that a petitioner is not relieved of his or her burden of proving prejudice simply because he or she alleges that his or her trial counsel caused structural error.

Ramirez does not contend that this case involves any of the circumstances under which the presumption of prejudice applies; and, upon independent review, we are satisfied that the presumption of prejudice does not apply here.  Specifically, there was no "[a]ctual

or constructive denial of the assistance of counsel altogether[,]" and Ramirez's trial counsel was not "burdened by an actual conflict of interest." Strickland, 466 U.S. at 692 (citation omitted). Accordingly, like most petitioners who allege ineffective assistance of counsel, Ramirez has the burden of proving both deficient performance and prejudice. See Cronic, 466 U.S. at 658.

Although we are satisfied that Ramirez has met the burden to prove that trial counsel's performance was deficient, we conclude that he has not met the burden to prove that his trial counsel's performance was prejudicial. In other words, Ramirez has failed to show that "there was a substantial or significant possibility that the verdict[s were] affected" by his trial counsel's conduct. Syed, 463 Md. at 86-87, 204 A.3d at 154 (cleaned up).

As the Supreme Court explained in Strickland, id. at 696, "a verdict [that is] only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." In other words, generally, a petitioner fails to prove that his or her trial counsel's performance prejudiced him or her where, at trial, the State offered strong evidence of the petitioner's guilt. For example, in Syed, 463 Md. at 97, 204 A.3d at 160, this Court held that the petitioner had not met the burden to prove that his trial counsel's failure to call a potential alibi witness prejudiced him. This Court explained: "[T]he State's case against [the petitioner] could not have been substantially undermined merely by the alibi testimony [] because of the substantial direct and circumstantial evidence pointing to [the petitioner]'s guilt." Id. at 97, 204 A.3d at 160. Similarly, in Walker, 391 Md. at 256, 892 A.2d at 560-61, this Court determined that the petitioner had

not established ineffective assistance of counsel based on his trial counsel's minimal participation at trial, explaining: "[T]he case against [the petitioner] was built upon substantial documentary and testimonial evidence. Here, the record reflects no defense [that the petitioner] could have asserted if counsel had behaved differently."[12]

Here, the State offered both strong direct evidence and circumstantial evidence of Ramirez's guilt. Indeed, there was overwhelming evidence that Ramirez was the man with an orange ski mask and a sawed-off shotgun, who, on October 11, 2004, together with the man with a green ski mask and a revolver, robbed Ms. and Mr. Hidey of approximately $80,000 that had been in a safe in the Hideys' house. The State's evidence demonstrated that Ramirez was aware of the presence of the safe at the Hideys' house; he planned and attempted an unsuccessful burglary of the Hideys' house on September 4, 2004; he executed the October 11, 2004 armed robbery; he was seen with the $80,000 from the safe after the armed robbery; and he sought to create a false alibi.

Specifically, the State's evidence established that, years before the October 11, 2004 armed robbery, Ramirez knew not only that the Hideys' house contained the safe, but also that the safe contained a large amount of cash. The State also offered overwhelming evidence that, on September 4, 2004—*i.e.*, a month and a week before the October 11, 2004 armed robbery—Ramirez and Mr. Burkett attempted to enter the Hideys' then-

---

[12]The principle that strong or overwhelming evidence of guilt undermines the likelihood of proof of prejudice in the Strickland analysis is well-established. See Strickland, 466 U.S. at 696; Syed, 463 Md. at 97, 204 A.3d at 160; Walker, 391 Md. at 256, 892 A.2d at 560-61. This principle is distinct from a harmless-error analysis, which would be conducted on direct appeal.

unoccupied house through a window, but fled upon hearing an alarm, and returned on October 11, 2004 and committed the armed robbery.

Ms. Burkett's testimony demonstrated that, after the September 4, 2004 attempted burglary, Ramirez and Mr. Burkett prepared for the October 11, 2004 armed robbery. Ms. Burkett testified that she served as the getaway driver for the October 11, 2004 armed robbery, that she dropped Ramirez and Mr. Burkett off in the area of a house on Ridge Road, and that Ramirez and Mr. Burkett exited the vehicle, with guns and a pillowcase and put on the ski masks. Later, Ms. Burkett picked up Mr. Burkett and Ramirez, and Mr. Burkett said that they had left their tool bag behind.

The testimony of both Ms. Hidey and Mr. Hidey was consistent with Ms. Burkett's testimony that Ramirez was the man with an orange ski mask and a sawed-off shotgun in their home. Also, the testimony of Ms. and Mr. Hidey indicated that they knew the sound of Ramirez's voice, and that the man in the orange ski mask avoided letting Ms. and Mr. Hidey hear his voice because he was afraid that they would recognize it.

The State offered multiple pieces of physical evidence that corroborated Ms. Burkett's testimony that Ramirez and Mr. Burkett were the two men who committed the robbery at Mr. and Ms. Hidey's house on October 11, 2004. There was the orange ski mask that was found at the Burketts' residence; Ms. Burkett testified that the orange ski mask in evidence belonged to Mr. Burkett, and that she had sewn and given to Ramirez a "similar" orange ski mask. There was the green ski mask that was found by the side of Ridge Road; Ms. Burkett testified that the green ski mask in evidence belonged to Mr. Burkett, and both Ms. Hidey and Mr. Hidey testified that the green ski mask in evidence

looked like the one that one of the robbers had worn. There was the revolver that Trooper First Class Workman found in a box under a shed after meeting with Mr. Burkett; Ms. Burkett testified that the revolver in evidence was the one that she had bought for Mr. Burkett, and both Ms. Hidey and Mr. Hidey testified that the revolver in evidence looked like the one that the man in the green ski mask had carried. There was the duffel bag that was found near the Hideys' house; Ms. Burkett testified that the duffel bag in evidence belonged to Mr. Burkett, and Fincham testified that the duffel bag in evidence was the one that Mr. Burkett had put a crowbar, a saw, and two Halloween masks into on September 4, 2004.

Ms. Burkett testified that, after the October 11, 2004 armed robbery, Ramirez had a pillowcase with $80,000 in cash. Vollmer's, Ramirez's girlfriend's, testimony constituted evidence that, after being accused of participating in the October 11, 2004 armed robbery, Ramirez attempted to fabricate an alibi.

In sum, the State offered strong direct and circumstantial evidence of Ramirez's guilt, including extremely inculpatory testimony not only by both victims (Ms. and Mr. Hidey), but also by the getaway driver (Ms. Burkett). The strength of the State's case against Ramirez leads to the conclusion that there is no substantial or significant possibility that the outcome of the trial would have been different had Juror 27 not served on the jury. Tellingly, the jury did not submit any questions during deliberations, deliberated for less than three hours, and found Ramirez guilty of all eleven charges. These circumstances support our determination that the State's evidence was strong—indeed, overwhelming— and that there is no substantial or significant possibility that the outcome of the trial would

- 46 -

have been different but for Juror 27's presence on the jury.

Significantly, Ramirez fails to marshal even a colorable argument that he was prejudiced. Indeed, both on brief and at oral argument, Ramirez's postconviction counsel seemed to take the position that Juror 27's response to the "crime victim" question, without more, conclusively establishes that Juror 27's presence on the jury was prejudicial. In his brief, Ramirez's postconviction counsel argues that Ramirez "was 'guilty from the start' when [Juror 27] was seated." Similarly, at oral argument, after being asked what circumstances showed that, but for Juror 27's presence on the jury, the trial's outcome would have differed, Ramirez's postconviction counsel stated that "the 'but for' is really just the seating of the juror." In making this assertion, Ramirez's postconviction counsel essentially conflates the performance prong and the prejudice prong—*i.e.*, he essentially presumes that, because Ramirez's trial counsel erred, that error must have been prejudicial.

A "court does not presume [that a petitioner] suffered prejudice" simply because the court has concluded that the petitioner's counsel's "performance was deficient[.]" Syed, 463 Md. at 87, 204 A.3d at 154 (citation omitted). "In other words, [not] every mistake made by trial counsel . . . cause[s] prejudice[.]" Id. at 87, 204 A.3d at 154 (citations omitted). The question is whether there is "a substantial or significant possibility that the verdict[s were] affected" by the petitioner's counsel's error. Id. at 87, 204 A.3d at 155 (cleaned up). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test[.]" Strickland, 466 U.S. at 693 (citation omitted). Here, Ramirez has failed to meet the burden to prove that there is a substantial or significant

possibility that his trial counsel's failure to challenge Juror 27 affected the verdicts.

For the above reasons, Ramirez has failed to prove prejudice. Thus, as the circuit court and the Court of Special Appeals concluded, Ramirez's allegation of ineffective assistance of counsel fails.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**

IN THE COURT OF APPEALS

OF MARYLAND

No. 72

September Term, 2018

_____

EDINSON HERRERA RAMIREZ

v.

STATE OF MARYLAND

_____

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Booth
Wilner, Alan M. (Senior Judge,
Specially Assigned),

JJ.

_____

Concurring and Dissenting Opinion
by McDonald, J.

_____

Filed: July 12, 2019

*Greene, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to the Md. Constitution, Article IV,
Section 3A, he also participated in the decision
and adoption of this opinion.

As the Majority Opinion explains, in a postconviction case, the evaluation of a claim of ineffective assistance of counsel has two parts: (1) Was counsel's performance deficient? and (2) Was the defendant prejudiced?[1]

*Deficient Performance*

I agree with the Majority Opinion's analysis of the first issue in this case. *See* Majority slip op. at 31-38. The performance of defense counsel was deficient when she did not move to strike for cause a prospective juror who admitted that he could not be fair and impartial. It is quite clear that defense counsel would have had no difficulty excluding that prospective juror on that ground. The trial judge granted her motions to strike other prospective jurors for similar reasons. (The State's Attorney appropriately expressed no opposition). Defense counsel evidently had no tactical reason for wanting this admittedly biased individual to sit on the jury. She belatedly and unsuccessfully tried to have him struck from the jury for a different and less compelling reason. In her testimony during the postconviction hearing in the Circuit Court, she did not recall any specific reason for leaving that individual on the jury.

*Prejudice*

I disagree with the Majority Opinion's analysis of the second issue.

As the Majority Opinion indicates, not every error that falls under the rubric of "structural error" involves the type of prejudice that merits postconviction relief. In *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017), the Supreme Court recognized

---

[1] *See Strickland v. Washington*, 466 U.S. 668 (1984).

that the concept of "structural error" encompasses at least three categories of errors, not all of which necessarily involve harm to a defendant. However, the Court also noted that the effects of some structural errors are so difficult to measure that it is impossible to show that the error was harmless beyond a reasonable doubt. *Id.* And some structural errors – such as denial of counsel or the failure to give a reasonable doubt instruction – alone render a trial "fundamentally unfair."

The Supreme Court recognized in *Weaver* that the prejudice inquiry with respect to a claim of ineffective assistance of counsel ultimately depends on "the fundamental fairness of the proceeding." *Id.* at 1911 (quoting *Strickland*). Ineffective assistance of counsel that renders a trial fundamentally unfair is not only structural error, but also is prejudicial by definition.[2]

An indispensable element of a fair trial is an impartial arbiter. This Court has opined that the right to a fair trial guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Constitution is a "promise that a defendant's fate will be determined by an impartial fact finder who depends solely on the evidence and argument introduced in open court." *Williams v. State*, 394 Md. 98, 106 (2006); *see also Smith v. Philips*, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing

---

[2] In *Weaver*, the Supreme Court held that the particular structural error at issue did not fall into the category of those that are fundamentally unfair and thus did not entail a presumption of prejudice in the postconviction proceeding. 137 S. Ct. at 1912-14. In that case, the trial court had closed the courtroom during jury selection, which violated the defendant's right to a public trial. The Court concluded that a public trial violation does not necessarily render the trial fundamentally unfair, at least when it occurs during jury selection. (The Court suggested that the result might be different in other situations – *e.g.*, if the courtroom had been closed during testimony by the prosecution's main witness).

to decide the case solely on the evidence before it"). It has long been held, and perhaps goes without saying, that a biased jury "violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). One could fill pages with quotations from every court in the country expressing the principle that an impartial jury is one of the most basic and essential elements of our criminal justice system and that the presence of a biased individual on a jury deprives a defendant of that right.

Had defense counsel moved to exclude this biased juror for cause and the trial court seated the juror in the face of that objection, any ensuing conviction would clearly have been reversed on direct appeal on the basis that the defendant had been denied the right to an impartial jury. *Williams*, 394 Md. at 109-17 (reversing conviction and remanding for new trial for violation of right to impartial jury because juror failed to disclose that she was related to employee of prosecutor's office). But when defense counsel fails to raise such an issue during voir dire, the claim would likely be defeated on direct appeal due to waiver or non-preservation. A postconviction claim based on counsel's defective performance is the only way to vindicate this fundamental constitutional right.

Courts have not hesitated to grant postconviction relief when it is established that the jury that returned the conviction included a biased member. *See, e.g.*, *Wolfe v. Brigano*, 232 F.3d 499, 503 (6th Cir. 2000) (granting postconviction relief and reversing murder conviction due to presence of biased jurors because "[f]ailure to remove biased jurors taints the entire trial"); *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc) (granting postconviction relief and reversing murder conviction due to presence of biased juror because "[t]he bias or prejudice of even a single juror would violate [the defendant]'s right

- 3 -

to a fair trial").

In my view, an error by counsel that deprives a defendant of the right to an impartial jury results in a fundamentally unfair trial and is necessarily prejudicial. In a federal postconviction case with facts very similar to this one, the Sixth Circuit reversed a conviction on the basis of ineffective assistance of counsel. *Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001). In *Hughes*, a prospective juror in a federal theft and firearms prosecution admitted that she did not think she could be fair to the defendant based on her personal relationship with local police officers. Defense counsel did not move to strike for cause or exercise a peremptory strike and, as a result, the admittedly biased prospective juror was selected as a juror. The Sixth Circuit held that there was prejudice because the defense counsel's inaction had effectively waived the defendant's "basic Sixth Amendment right to trial by an impartial jury." 258 F.3d at 463.

The Majority Opinion seems to hold that a defendant who has been found guilty by a jury that includes an admittedly biased juror must have evidence of prejudice beyond the biased individual's presence on the jury. The Majority Opinion does not suggest how a defendant could do so. As in most other jurisdictions,[3] our rules preclude testimony from jurors concerning their deliberations. *See* Maryland Rule 5-606(b). A petitioner in Mr. Ramirez's shoes would face the same roadblock even if *all* of the jurors who had professed bias during the jury selection process had been seated on the jury.

The Majority Opinion concludes with a sort of harmless error argument based on its

---

[3] *See, e.g.*, Federal Rule of Evidence 606.

- 4 -

evaluation of the strength of the evidence at trial.  Majority slip op. at 43-46.  The logic seems to be that, if the evidence is strong enough, it does not matter whether one is tried by an impartial tribunal.  Not even the State makes such an argument.  We should not adopt such a principle.